UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-----------------------------------------------------------------x

UNITED STATES OF AMERICA          :     Hon. Jose L. Linares

                 v.                  :

                               :     Crim. No. 2:16-cr-00065-JLL

VINCENT J. OPALEWSKI, and
BRIAN C. STEPPIG,           :

                Defendants.    :

-----------------------------------------------------------------x

---

REPLY MEMORANDUM OF THE UNITED STATES
IN SUPPORT OF ITS MOTION *IN LIMINE* TO ADMIT AT TRIAL AN EXCEL
SPREADSHEET PREPARED BY DEFENDANT BRIAN STEPPIG

---

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 2

   I.   Admitting the Steppig Log Would Not Create a *Bruton* Problem Because The Statements
      Contained in the Steppig Log Are Non-Testimonial ......................................................... 2

   II.  The Steppig Log Entries All Fit Within Rule 801's Exemptions for Party Opponent and
      Co-Conspirator Statements ...................................................................................... 4

   III. Although Courts Do Not Inquire Into the Reliability of Statements that Meet
      Firmly Rooted Hearsay Exceptions, Numerous Factors Support the Reliability of
      the Steppig Log ................................................................................................... 16

   IV. The Steppig Log Is Admissible Against Both Defendants Under Rule 807's Residual
      Hearsay Exception .............................................................................................. 20

      A. The Steppig Log Has Important Indicia of Trustworthiness ...................................... 21

      B. The Steppig Log is More Probative as to Steppig's Guilt Than Any Other
      Single Piece of Evidence ........................................................................................ 22

CONCLUSION ...................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Bourjaily v. United States*, 483 U.S. 171 (1987)............................................................. 16

*Bruton v. United States*, 391 U.S. 123 (1968) ................................................................. 2

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................................................. 3

*Davis v. Washington*, 547 U.S. 813 (2006)..................................................................... 2

*United States v. Anmar*, 714 F.3d 238 (3d Cir. 1983) ..................................................... 6

*United States v. Berrios*, 676 F.3d 118 (3d Cir. 2012) .................................................... 2

*United States v. Hendricks*, 395 F.3d 173 (3d Cir. 2005) .............................................. 16

*United States v. Hendricks*, 395 F.3d 173 (3d Cir. 2005) ................................................ 3

*United States v. McGlory*, 968 F.2d 309 (3d Cir. 1992)................................................... 4

**<u>Rules</u>**

**Fed. R. Evid. 801** ....................................................................................................*passim*

**Fed. R. Evid. 801(d)(2)(A)** .....................................................................................*passim*

**Fed. R. Evid. 801(d)(2)(E)** .....................................................................................*passim*

**Fed. R. Evid. 807** .............................................................................................. 1, 2, 20, 21

## PRELIMINARY STATEMENT

Faced with the prospect of having to defend against a smoking gun document prepared by one of the defendants that lays bare the conspiracy with which they are both charged, Defendants Brian Steppig and Vincent J. Opalewski (the "Defendants") offer several objections in an attempt to shield the jury from the Steppig Log.  In particular, the Defendants claim that: (i) admitting the Steppig Log against Opalewski would violate the Confrontation Clause and the Supreme Court's decision in *Bruton v. United States*; (ii) the entries contain multiple layers of hearsay for which there are no applicable exemptions; (iii) the "provenance" of the Steppig Log is "murky" and the document itself is unreliable; (iv) the Steppig Log does not fit within Rule 807's residual hearsay exception because it is untrustworthy and less probative than other pieces of evidence the Government can introduce.  The Defendants are wrong on all counts.

First, each and every statement contained in the Steppig Log is non-testimonial and, therefore, its introduction against Opalewski does not present an issue under the Confrontation Clause or *Bruton v. United States*.  Second, as the Government's comprehensive statement-by-statement review shows, every entry in the Steppig Log falls within Rule 801's exemptions for statements by a party opponent or statements by co-conspirators, as every layer of every entry can be attributed to Steppig (a party opponent) and at least one other co-conspirator.  And where the Government relies on Rule 801(d)(2)(E), it has articulated a clear rationale for why the relevant statement furthered the charged conspiracy.

Third, the Defendants' reliability arguments as they relate to admissibility under Rule 801 are completely misplaced in that they ignore long-established Supreme Court precedent, which requires no independent inquiry into the reliability of non-testimonial statements that fall within firmly rooted hearsay exceptions.  But even if the Court conducts an independent inquiry

1

into the Steppig Log's reliability, numerous factors indicate that it is reliable.  In particular, the metadata, the entries themselves, and the corroborating documents leave no doubt that Steppig was the first and last author of the log, that he maintained its entries contemporaneously as the events of the conspiracy occurred, that he stored it on his computer and it was later retrieved from that computer, and he had every incentive to accurately memorialize its contents.

Finally, the Defendants' Rule 807 arguments are also wide of the mark because the Steppig Log carries important indicia of trustworthiness, and the spreadsheet is more probative as to Steppig's knowledge of and participation in the conspiracy than any other single piece of evidence.

## ARGUMENT

### I.   Admitting the Steppig Log Would Not Create a *Bruton* Problem Because The Statements Contained in the Steppig Log Are Non-Testimonial

The "Confrontation Clause bars the use of the confession of a nontestifying criminal defendant in a joint trial to the extent that it directly inculpates a co-defendant."  *United States v. Berrios*, 676 F.3d 118, 128 (3d Cir. 2012) (citing *Bruton v. United States*, 391 U.S. 123 (1968)).  Here, the Defendants argue that admitting Steppig's statements against Opalewski would somehow create a *Bruton* problem.  This argument, however, overlooks the settled principle that the protections afforded by the Confrontation Clause and *Bruton* apply only to *testimonial* statements.  *Id.* at 128.

The Third Circuit has explained that the first step in the Confrontation Clause analysis is to determine "whether the contested statement by an out-of-court declarant qualifies as testimonial" under the Supreme Court's decision in *Davis v. Washington*, 547 U.S. 813 (2006), and its progeny.  *Id.* at 126.  Where the "absent witness's statement is testimonial, then the Confrontation Clause requires 'unavailability and a prior opportunity for cross-examination.'"

2

*Id*. (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004)).  On the other hand, "[i]f the statement is nontestimonial, then admissibility is governed solely by the rules of evidence.  *Id*. at 127 (citing *Davis*, 547 U.S. at 823).  Here, there is no serious question that the statements in the Steppig Log are non-testimonial.

Although there is no precise or all-encompassing guidance on what makes a statement testimonial, *Crawford* offers some illustrative examples, including: (i) statements to law enforcement; (ii) *ex-parte* in-court testimony; (iii) extrajudicial statements such as affidavits, depositions and interrogatories; and (iv) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  541 U.S. at 151.  Defendants cannot show that the statements fit into the first three categories. They also fail to explain how the various co-conspirators could reasonably have believed, at the time these inculpatory statements were made or memorialized, that they would be available for use in a later prosecution.  After all, if Steppig believed that the spreadsheet would later be used in a prosecution of the co-conspirators, he surely would not have included statements that inculpated *himself*.  Moreover, the Third Circuit already has held that party opponent and co-conspirator statements such as those memorialized in the Steppig Log are non-testimonial.  *United States v. Hendricks*, 395 F.3d 173, 183-84 (3d Cir. 2005).

Given that the statements in the Steppig Log are non-testimonial, *Bruton* simply is not implicated here, and their admissibility turns solely on the evidentiary principles that the parties have been debating.  *Berrios*, 391 U.S. at 127-28.

## II.   The Steppig Log Entries All Fit Within Rule 801's Exemptions for Party Opponent and Co-Conspirator Statements

The Government has argued that the Steppig Log is admissible against both Defendants because its entries fall within Rule 801's non-hearsay exemptions for party opponent and co-conspirator statements.  Gov. Br. at 1.  In response, the Defendants accuse the Government of failing to "engag[e] in a rigorous, layer-by-layer analysis," of the admissibility of each statement.  This argument, however, overlooks the fact the Government appended to its opening a brief an extensive chart that *did* offer a statement-by-statement analysis of how each entry was admissible against both Defendants.  *See* Gov. Opening Br. Ex. 2.

Defendants also argue that the log "demonstrates that it was manifestly not created as a statement or collection of statements in furtherance of the conspiracy" because "it reports past events that require no follow-up." Defs'. Br. at 7.  First, this counter-factual argument ignores the plain language of the statements themselves, including the December 13, December 19, January 9, February 14, and February 15 entries, which track the conspirators' communications about particular *upcoming* bids, many of which require *future* action by ▮▮▮▮▮, Steppig, and their co-conspirators at General, including Opalewski.  Second, even if the Defendants' point were accurate (it is not) it should not affect the Court's analysis because a statement can still come in under Rule 801(d)(2)(E) where it records past events as a method of keeping track of the conspiracy.  *United States v. McGlory*, 968 F.2d 309, 338 (3d Cir. 1992).

Given the Defendants' attempt to muddy the analytical waters, another statement-by-statement review is in order.[1]

---

[1]   The Government notes that, for purposes of this motion, Defendants have conceded the existence of the charged conspiracy and that they were both members of that conspiracy.  Defs'. Br. at 7.

### A.  November 22, 2005

"█ *had a phone call with* ████" 

This is a statement by Steppig and is admissible against him under Rule 801(d)(2)(A). *See McGlory*, 968 F.2d at 334 n.17 (when a defendant is the author of a document, the statements therein are admissible against him as statements by a party opponent).[2]  This part of the entry is admissible against Opalewski under Rule 801(d)(2)(E) because the statement reflects one of his co-conspirator's (Steppig) efforts to memorialize key facts related to the conspiracy. As the Government has explained, entries like this are akin to drug ledgers that courts have held to be admissible in that the writing furthers the conspiracy by allowing a conspirator to keep track of its granular details—in this case the date and nature of a phone call between conspirators.

In *McGlory*, the Third Circuit upheld the admission of drug ledger under Rule 801(d)(2)(E), finding that the information contained therein—the amount the defendant paid for drugs, the quantities purchased by customers, and the defendant's profits—furthered the conspiracy in that the ledger was the defendant's method of keeping track of his business.  968 F.2d at 338.  Here, Defendants fail to explain how the Steppig Log is materially distinguishable.

---

[2]     The Government addresses below, *see infra* pp. 16-17, Defendants' apparent argument that there are legitimate questions surrounding whether Steppig was the author of the Steppig Log.

"[██████████] stated [General] increased ██████████ by about $27/ton."

This is also a statement by Steppig and is admissible against him under Rule 801(d)(2)(A), but it arguably contains two additional embedded layers: ████████ direct statement to ████████ on the call and ████████ relaying of that statement to Steppig. But even assuming that ████████ took the call with ██████ alone and later passed the information on to Steppig, both layers of the statement would come in under Rule 801(d)(2)(E).

████████ statement to ████████ and ████████ statement relaying this information to Steppig *both* were made to co-conspirators and were designed to further the conspiracy. Specifically, ████████ statement about General's bid price to ████████ gave ████████ comfort that GEO could raise its prices on this account, and ████████ reported that statement in order to apprise Steppig that ████████ was subject to the companies' collusive agreement. *See United States v. Anmar*, 714 F.3d 238, 252 (3d Cir. 1983) (the "in-furtherance" requirement is met where a statement "serve[s] to maintain trust and cohesiveness" among co-conspirators).

### B. December 13, 2005

"██ called ████████ and asked [for] pricing for ████████████."

This is a statement by Steppig and is admissible against him under Rule 801(d)(2)(A). To the extent that the entry also memorializes a statement made by ████████ to Steppig, ████████ statement (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ████████ are admissible against Opalewski under Rule 801(d)(2)(E).

These statements memorialize a discussion between ████████ and ██████ regarding General's alum pricing for the ██████ paper mill at ████████. As is clear from the second

6

statement in the entry, ████████ called ████████ to learn General's pricing in order to ensure that GEO did not take the business by submitting a lower bid. Such discussions clearly further one of the goals of the conspiracy: to allocate customers between GEO and General and avoid competition.

> "*[████] Came to me and told me to bid $198.73 so that we would not take General's business*."

This is a statement by Steppig and is admissible against him under Rule 801(d)(2)(A). To the extent that the entry also memorializes a statement made by ████████ to Steppig, ████████ statement (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ████████ are admissible against Opalewski under Rule 801(d)(2)(E).

In this statement, ████████ conveyed the stay-away price (*i.e.*, the price GEO needed to submit to lose the bid) to Steppig because he would have to submit GEO's bid to ████. It clearly shows one conspirator instructing another to take a concrete *future* step to ensure the functioning of the conspiracy. And the fact that Steppig recorded ████████' bid price instruction to the penny is additional evidence that Steppig used the log to further the conspiracy by keeping track of granular details like bid pricing.

### C. December 19, 2005 – 1st Entry

> "*General called ████ and they wanted to know which ████ accounts GEO had so they would not bid against us.*"

This is a statement by Steppig and is admissible against him under Rule 801(d)(2)(A). To the extent that the entry also memorializes a statement made by ████████ to Steppig, ████████ statement (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). And for the reasons already explained, *i.e.,* that these were statements memorialized to keep track of the conspiracy, it is also admissible against Opalewski under Rule

801(d)(2)(E).  Furthermore, any statements made by co-conspirators at General are also admissible against Steppig and Opalewski under Rule 801(d)(2)(E).

Each of the statements in this entry were made to further a goals of the conspiracy—here, to ensure that GEO would keep its historical ██████ mills.  And the statements memorialize *future* actions that co-conspirators at General would take to conform to and abide by the parties' customer allocation agreement.

### D.  December 19, 2005 – 2nd Entry

"██ *talked with General and told them what price to bid for the* ██ *accounts we have*."

This is a statement by Steppig and is admissible against him under Rule 801(d)(2)(A).  To the extent that the entry also memorializes a statement made by ██████ to Steppig, ██████ statement (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E).  Both Steppig's statement and any statement made by ██████ are admissible against Opalewski under Rule 801(d)(2)(E).

In these statements, ██████ instructs General to submit an intentionally losing bid, which would further the companies' unlawful customer allocation.  ██████ passes this information on to Steppig to keep him apprised of the conspiracy.

### E.  January 9, 2006 – 1st Entry

"██ *talked with General and they said their bids were due today for* ██."

This is a statement by Steppig and is admissible against him under Rule 801(d)(2)(A).  To the extent that the entry also memorializes a statement made by ██████ to Steppig, ██████ statement (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E).  Both of these statements are also admissible against Opalewski under Rule

801(d)(2)(E).  Furthermore, any statements made by co-conspirators at General are also admissible against Steppig and Opalewski under Rule 801(d)(2)(E).

As is clear from the February 14 entry, the information shared in these statements was part of GEO's and General's attempt to coordinate their future pricing for ████████.  This coordination was done so that GEO and General could submit similar prices to a mutual customer.  By offering ██████ increased prices in lockstep, GEO and General would reduce ██████ ability to pit the competitors against each other, thereby furthering a goal of the conspiracy: increased profits through higher pricing.

### F.  January 9, 2006 – 2nd Entry

"███ *mentioned that* ████████ *[sic] now works for General in the marketing position and he is better friends with him than he was with* ████████ *[sic]. We will have no problems from now on*."

This is a statement by Steppig and is admissible against him under Rule 801(d)(2)(A).  To the extent that the entry also memorializes a statement made by ████████ to Steppig, ████████ statement (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E).  Both of these statements are also admissible against Opalewski under Rule 801(d)(2)(E).  Furthermore, any statements made by co-conspirators at General are also admissible against Steppig and Opalewski under Rule 801(d)(2)(E).

Knowing whom to trust when discussing accounts and pricing helped the co-conspirators further the conspiracy to allocate customers and increase prices.  And ████████ reassurance to Steppig that the conspiracy will run more smoothly since ██████ is in the marketing position is a well-established type of co-conspirator statement.  *See Anmar*, 714 F.3d at 252 (the "in-furtherance" requirement is met where a statement "provide[s] reassurance" among co-conspirators).

### G. January 9, 2006 – 3rd Entry



"███ *talked with General and told them to bid above \$260/ton for* ████████ *in* ████████ *in order for GEO to receive the alum award*."

This entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). To the extent that the entry memorializes a statement made by ████████ to Steppig, ████████ statement (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ████████ are admissible against Opalewski under Rule 801(d)(2)(E).

The statements were made to further the conspiracy in that they memorialize instructions given by ████████ to his co-conspirators at General. This entry, like many others, is not simply a recording of *past* events. By telling his co-conspirator at General to bid above \$260/ton for ████████, ████████ was furthering one of the goals of the conspiracy—for GEO to keep its historical customers—by ensuring that General would lose the *upcoming* bid.

### H. February 14, 2006 – 1st Entry

"*Discussed the draft of the* ████ *contract with* ████ *He wants to have a \$3-6 adder to each year's price increase since there is a gap between what GEO offered and what General offered to* ████████."

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). To the extent that the entry memorializes a statement made by ████████ to Steppig, ████████ statement (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ████████ are admissible against Opalewski under Rule 801(d)(2)(E).

These statements clearly were made to further the conspiracy. Steppig's statement (*i.e.*, the entry itself) memorializes the instructions he received from his boss on how to price alum to ████████. ████████ underlying statement to Steppig gives instructions to a co-

10

conspirator and subordinate on how to carry out the conspiracy; increase prices by $3-$6 per year to keep GEO's prices close to what General offered at ████████████████████, and ████ mills. Both statements reveal that Steppig and ██████████ were seeking to further a goal of the conspiracy—increase profits by raising prices rather than increasing volume.

> "████ *opened his files and said that General offered $178, $181 and $176/ton respectively*."

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). ██████████ underlying statement to Steppig (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ██████████ are admissible against Opalewski under Rule 801(d)(2)(E). And like the other statements contained in this entry, these statements reveal that Steppig and ██████████ were looking to General's offered prices at ████████████████████ ████ mills so that they could submit similar prices on behalf of GEO. By offering █████ increased prices in lockstep, GEO and General would reduce ██████ ability to pit the competitors against each other, thereby furthering a goal of the conspiracy: increased profits through higher pricing.

### I. February 14, 2006 – 2nd Entry

> "████ *received an e-amil [sic] and is to meet for lunch with upper management (Vince) at General on Friday, February 17*."

This entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). To the extent that the entry memorializes a statement made by ██████████ to Steppig about his email, ██████████ statement (the second layer of hearsay) is also admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ██████████ are admissible against Opalewski under Rule 801(d)(2)(E). The statements were

made to further the conspiracy in that it was Steppig's method of memorializing important facts about the conspiracy, including *prospective* meetings among co-conspirators.

### J. February 15, 2016

" *called* ███████████ *[sic] and talked about* ██ *pricing."*

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). Steppig's statement is also admissible against Opalewski under Rule 801(d)(2)(E). The statement memorializes the name of a co-conspirator at General, ████ ████ who ██████████ or Steppig could speak to about accounts and pricing in order to ensure the continuing operation of the conspiracy. And the statement further reveals that the co-conspirators did discuss pricing that they would submit to ████████████. Coordinating pricing offered to customers helped the co-conspirators achieve their goals of increasing profits.

"██████ *said 'You know my pricing so what are you going to quote?'"*

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). █████████ underlying statement to █████ (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by █████████ are admissible against Opalewski under Rule 801(d)(2)(E). As mentioned above, GEO's and General's coordination of pricing offered to customers helped the co-conspirators achieve their goals of increasing profits.

"██████ *told him they would submit price increases around $37-39/ton."*

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). █████████ underlying statement to █████████ (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ████ are admissible against Opalewski under Rule 801(d)(2)(E).

As mentioned above, by offering customers like ███████████ increased prices in lockstep, GEO and General would reduce the customer's ability to pit the competitors against each other.

"███ *told him to remain firm on this since we had submitted price increases of $40/ton across the board. He wanted these increases to go through.*"

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). ███████ underlying statement to ████ (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ████████ are admissible against Opalewski under Rule 801(d)(2)(E).

These statements explicitly link General's price increases with GEO's ability to also raise prices on its ██████████ mills.

**K. May 1, 2006**

"███ *called* ██████████ *[sic] on his cell phone and stated that* ███████████ *[sic] wanted us to bid on* ██████████ *He said we were going to bid $166.60/ton and wanted to know if this would create a problem for General.*"

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). ███████ underlying statement to ████ (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ████████ are admissible against Opalewski under Rule 801(d)(2)(E). Here, ██████ raised the fact that ███████████ was asking for a bid, and he disclosed the bid that GEO planned to offer in order to avoid any friction in the conspiracy that might result from GEO bidding on a General account.

13

'███ *mentioned that they had bid $158/ton and this should be no problem.  He also stated that they had raised their prices to* ██████████ *by $33-43/ton*."

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A).  ██████ underlying statement to ██████ (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E).  Both Steppig's statement and any statement made by █████ are admissible against Opalewski under Rule 801(d)(2)(E).

As mentioned above, GEO's and General's coordination of pricing offered to customers helped the co-conspirators achieve their goals of increasing profits.  Much like the prior statement in this entry, ███████ statements to ████████ reassure him that the conspiracy would continue even if GEO bid on ████████████████ mill.  In particular, ██████ statements tell ██████████ that he and Steppig would be permitted to submit a higher price to ██████████ without breaching the agreement between GEO and General.  By submitting a higher price than General's, █████████ and Steppig would either intentionally lose the ████████████████ business, or would take it at a premium over General's price, either of which was permissible under the terms of the agreement.

'███ *mentioned that we had raised our prices up to $60/ton and that we were to meet with* ██████████ *on May 23rd at 1:30 pm to discuss our proposal*."

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A).  ██████████ underlying statement to ████ (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E).  Both Steppig's statement and any statement made by ██████████ are admissible against Opalewski under Rule 801(d)(2)(E).

GEO's and General's coordination of pricing helped the co-conspirators achieve their goals of increasing profits.  And the statements outlining when ████████ and Steppig would

14

meet with ███████████ simply apprised their co-conspirators at General of a meeting that could impact the conspiracy.

> "██ *said they were to meet with them on the same day at 2:30 pm.*"

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). ████████ underlying statement to ████████ (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ██████ are admissible against Opalewski under Rule 801(d)(2)(E).

████████ statement regarding General's meeting with ████████████ similarly was designed to keep his co-conspirators at GEO apprised of when General planned to meet with a mutual customer that was part of the GEO/General conspiracy.

> "██ *laughed and said that maybe GEO and General should go together.  After this,*
> ██ *mentioned he noticed General had taken a 200 ton GEO account in* ████████████
> *He said that GEO would take a 200 ton account of General's and that they should not be*
> *upset.  This was just making the playing field even again.*"

This portion of the entry is a statement by Brian Steppig and is admissible against him under Rule 801(d)(2)(A). ████████ underlying statement to ████ (the second layer of hearsay) is admissible against Steppig under Rule 801(d)(2)(E). Both Steppig's statement and any statement made by ████████ are admissible against Opalewski under Rule 801(d)(2)(E).

GEO and General tracked which accounts were included in the conspiracy.  On the rare occasion that accounts changed hands between GEO and General, the co-conspirators would attempt to rebalance the playing field so that neither company had a net loss or gain of alum sold. Here, the statements show the co-conspirators discussing future plans to rebalance their volume after General took a 200-ton account from GEO.

### III.    Although Courts Do Not Inquire Into the Reliability of Statements that Meet Firmly Rooted Hearsay Exceptions, Numerous Factors Support the Reliability of the Steppig Log

Defendants attempt to cast doubt on the reliability of the Steppig Log, claiming that the "provenance" of the document is too "murky."  Defs'. Br. at 2.  This argument is off the mark for a variety of reasons.

As a threshold matter, if the Court accepts the Government's Rule 801 analysis, then Defendants' reliability arguments are simply irrelevant as long-standing Supreme Court precedent holds that "no independent inquiry into reliability is required when the evidence 'falls within a firmly rooted hearsay exception.'"  *Bourjaily v. United States*, 483 U.S. 171, 183 (1987); *United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005).  But even if the Court conducts an independent inquiry into the log's reliability, the metadata, the plain text of certain entries, and the corroborating documents establish that Steppig was the first and last author of the log, he maintained its entries contemporaneously as the events of the conspiracy occurred, he stored it on his computer and it was later retrieved from that computer, and he had every incentive to accurately memorialize its content.

The metadata is a treasure trove of information, all of which supports the Government's assertion that Steppig prepared this document and was the only one to edit it.  *See* Exhibit 1. First, it is clear that the Steppig Log was found on Brian Steppig's computer.  And although the Government collected a large volume of documents from many different GEO employees, the spreadsheet was not found on the computers (or in the emails) of any other custodian.

Second, the author fields clearly reflect that Steppig created the document and was the last person to edit it.  There is no indication that it was ever edited (let alone seen) by anyone else.  Third, the metadata reflects that Steppig created the document less than three weeks after

the date of the first entry in the spreadsheet and was the last person to edit it on May 3, 2006—
two days after the date of the last entry.

Fourth, the language used in some of the entries themselves shows that Steppig updated
the log in anticipation of future events or contemporaneously as the events happened.  In addition
to the entries from December 13, December 19, February 14, and February 15, which were
recorded *prior* to significant events in the conspiracy, Steppig's first entry on January 9 states
that "███ talked with General and they said their bids were due today for ████." Steppig's use
of "today" indicates that he updated the log on the same day that ██████ spoke with
General.

The Defendants' reliability argument also overlooks the text of various entries that, on
their face, clear up the supposedly "murky" identity of the document's author.  During the time
period captured in the Steppig Log, there were only three GEO employees who would have had
access to the information reflected in the document: ██████, ██████, and Steppig.  And
only one of those employees, Brian Steppig, was responsible for sales to paper mill customers.

The December 13, 2005 entry provides, in relevant part, that ██████ "came to *me*
and told *me* to bid $198.73 so that we would not take General's business [with ██████
██████.]." The text of the entry thus reflects that ██████ was giving the author of
the document instructions on how to bid on this paper mill account to ensure—consistent with
the parties' unlawful agreement—that General kept the business.  Similarly, the February 14
entry reflects that the author had a direct conversation with ██████ about the draft of the
██████ contract, an agreement with a paper mill company.  The Defendants do not event attempt
to attribute either of these entries to ███, nor could they given the metadata and the fact that

17

Steppig (not ███) was responsible for these customers.  That leaves only one plausible author:
Brian Steppig.

    Defendants' reliability arguments are also undercut by the fact that there are multiple
documents that corroborate the accuracy of the statements in the Steppig Log.  To take just a few
examples:

- In an email dated December 16, 2005, Steppig confirmed for ██████ that GEO finalized negotiations with ██████ and was able to secure an increase of $27/ton.  This supports the accuracy of the November 22 entry, which notes that ██████ told ██████ that General had increased its prices to ██████ by that exact amount.  *See* Ex. 2.

- In a letter to ██████, dated December 13, 2005 (the same date as the entry in the Steppig Log), Steppig quoted ██████ a bid of $198.73—the exact amount the Steppig Log states that ██████ instructed him to bid.  This document removes any doubt that the "me" referenced in the December 13 entry was Steppig.  *See* Ex. 3.

- GEO produced a document which shows the bid prices it submitted to ██████ between 1997 and 2006.  The document reflects that GEO bid $260/ton in 2006 and therefore corroborates the January 9, 2006 entry in which ██████ told General to bid above this exact amount in order to ensure that GEO kept the ██████ account.  *See* Ex. 4.

- In an email dated February 10, 2006—five days before the February 15 entry— Steppig emails ██████, copying others at GEO, and notes that GEO has a "tentative agreement to implement a $40/ton increase on March 1 at all ██████ mills."  This dovetails neatly with the February 15 entry, where Steppig recounts a conversation between ██████ and ███ in which ██████ encourages General to "remain firm" on their price increase to ██████ because GEO also was seeking a price increase with ██████.  *See* Ex. 5.

- In a memorandum to ██████, dated May 4, 2006, Steppig notes that GEO will be meeting with ██████ on May 23 to discuss their alum proposal.  Steppig's memorandum supports the accuracy of the May 1 entry, which also references GEO's May 23, 2006 meeting with ██████.  *See* Ex. 6.

- In a chain of emails, dated February 14, 2006, ██████ and Opalewski go back and forth about scheduling a lunch meeting.  This email supports the accuracy of the Steppig Log's February 14 entry.  *See* Ex. 7.

18

In light of all the surrounding circumstances—the layer-by-layer hearsay analysis, the metadata, the entries themselves, and the corroborating documents—there really is no serious doubt that the Government has met its burden to prove, by a preponderance of the evidence, that the Steppig Log should be admissible against both Defendants under Rule 801.  This, however, has not stopped the Defendants from interposing a variety of unpersuasive arguments for why the Steppig Log is nevertheless unreliable.

The Defendants suggest that the statements in the Steppig Log are unreliable because several entries do not record the name of the relevant General employee that ██████ spoke to.  Defs'. Br at 13.  Not so.  Given the fact many entries *do* mention General employees (including Opalewski) by name, it is not difficult to discern the identities of the unnamed General employees.  ██████ will testify that his contacts at General during the time period covered by the Steppig Log were Opalewski, ████, and ████.  Not surprisingly, all three are mentioned by name in certain entries.  It does not require a leap of logic to infer that the unnamed General employee was one these individuals.

Defendants further suggest that the Steppig Log is unreliable because "the author" (as if there is any doubt who the author is) "appears to have been either an imprecise recorder or not well informed" about the conspiracy because several of the conspirator's names are spelled wrong.  Defs'. Br. at 16.   It suffices to say that Steppig's typos have no bearing on the reliability of the entries.  First, at least with respect to ████, Steppig did manage to spell his name right in several entries.  Second, and more importantly, it is clear from the entries referencing ████ and ████ that Steppig knew these two individuals worked at General and that they were members of the conspiracy.  Furthermore, phone records produced in the Government's investigation show that he spoke with ████ on a regular basis.

19

Finally, the Defendants complain that the Government "makes no attempt to explain why five apparently irrelevant entries appear on the spreadsheet," and claim that these entries somehow "expose the unreliability" of the document.  Defs'. Br. at 3.  This argument truly strains credulity.  Four of these five entries reference a possible separate bid-rigging and customer allocation conspiracy with a different GEO competitor that do not directly bear on the charged conspiracy.[3]  Although the Steppig Log reflects that Steppig was aware of these conversations, because the Government did not notice this separate uncharged conspiracy as Rule 404(b) evidence, the Government decided that it would be *unfair to Steppig* (and to the individual mentioned in these entries) to include these statements.  In any event, the fact that entries referencing a separate conspiracy appear in the document actually *supports* the Government's argument.  The Government maintains that the Steppig Log is a spreadsheet devoted solely to memorializing GEO's collusive contacts with competitors; the fact that it includes four entries relating to a similar, uncharged conduct only supports the Government's characterization of the document.

## IV.    The Steppig Log Is Admissible Against Both Defendants Under Rule 807's Residual Hearsay Exception

The Government has shown that the Steppig Log is admissible against both Defendants under Rule 801.  Should the Court agree, then it need not delve into the applicability of Rule 807.  But if the Court has any doubt about whether the statements in the Steppig Log are non-hearsay, Rule 807 provides a strong, alternative basis for their admissibility.  The parties' dispute on this issue turns on the trustworthiness of the Steppig Log and whether it is more probative to

---

[3]     The remaining entry reflects ███████ frustration that ██████, a co-conspirator, was calling him "almost every day."

show Steppig's knowledge of and participation in the conspiracy than any other single piece of evidence.  The Government has the stronger arguments on both of these critical points.

### A.   The Steppig Log Has Important Indicia of Trustworthiness

The parties agree on the factors that the Court should consider in determining whether the Steppig Log is trustworthy.  *See* Gov. Br. at 13 (reciting the seven-factor test under Rule 807 for evaluating a document's trustworthiness); Defs'. Br. at 15.  In applying these factors, however, the parties reach markedly different conclusions.

The Government acknowledges that the statements were not made under oath and that the declarants did not know their assertions would be subject to cross examination.  However, the seven factors form a balancing test, so the fact that two of the factors disfavor the Government's argument is not outcome-determinative.  More importantly, the five remaining factors support the Steppig Log's admission under Rule 807.

With respect to the first factor, the primary declarant in the Steppig Log is ▮▮▮▮▮▮▮ and he is named many times in the spreadsheet.  Indeed, the Defendants even go so far as to say the spreadsheet should be titled the ▮▮▮▮▮▮ Log.  *See* Defs'. Br. at 1-2 ("All 11 entries the government seeks permission to use chronicle the activities and statements of ▮▮▮▮▮▮ . . .").  ▮▮▮▮ and ▮▮▮▮ also are specifically named as the other declarants.  And, as the Government already has explained, *see supra* pg. 19, while there are several references to unnamed General employees, it is clear from the context of the other entries and ▮▮▮▮▮▮ anticipated testimony that these unnamed conspirators are either ▮▮▮▮▮▮▮, or Opalewski.

As to the fourth factor, ▮▮▮▮▮—the source of the statements in the Steppig Log—clearly had personal knowledge of his own conversations with his co-conspirators at General.  Turning to the fifth factor, it is difficult to imagine what incentive the declarants would have had

to lie in these circumstances.  They all wanted the conspiracy to continue operating as planned and to ensure that they needed to provide one another with truthful, accurate information about bids and pricing.  And what incentive would ████████ have to lie in passing these conversations on to Steppig?  Steppig was ████████ subordinate and he relied on Steppig to carry out some of the day-to-day details of the business, including the preparation and submission of bids.  If ████████ wanted the conspiracy to function properly, he would have no reason to feed Steppig inaccurate information.

The sixth factor also supports the trustworthiness of the Steppig Log as there are multiple corroborating sources, including documents showing the accuracy of the entries, *see supra* pg. 18, and ████████ anticipated testimony, which will cast some light on the conversations referenced in the spreadsheet.  Finally, the seventh factor favors the admission of the Steppig Log as the declarants—all employees at GEO and General with knowledge of pricing and the bidding process for various customers—were qualified to make the statements memorialized in the Steppig Log.

The Defendants posit that the spreadsheet "may have been created to memorialize actions the author saw as problematic, possibly with an eye to future use in the event of litigation." Defs'. Br. at 11.  But even if that were true, then Steppig surely would have had a very powerful incentive to ensure that the statements in the spreadsheet were as accurate as possible.  The Defendants' apparent theory of why the Steppig Log was created therefore actually underscores the trustworthy nature of the document.

### B. The Steppig Log is More Probative as to Steppig's Guilt Than Any Other Single Piece of Evidence

The probative value of the Steppig Log is undeniable. The Government views the Steppig Log as a smoking gun.  Steppig, by his own hand, encapsulates the charged crime and

conversations among many of his co-conspirators (including his co-defendant) in a single document.  And there is no single piece of evidence against Steppig that will be as powerful as his own inculpatory statements.

## CONCLUSION

The Government has gone above and beyond its burden to prove the admissibility of the Steppig Log and the Defendants simply have not articulated any convincing bases for why it should be excluded.  Accordingly, the Government respectfully requests that the Court grant its motion *in limine* to admit the Steppig Log at trial against both Defendants.

Respectfully submitted,

Dated: August 28, 2017

/s/ Sean M. Farrell
Patricia L. Jannaco
Mary Anne F. Carnival
Frank A. Cavanagh
Sean M. Farrell

Trial Attorneys
United States Department of Justice
Antitrust Division
26 Federal Plaza, Suite 3630
New York, New York 10278
Telephone: (212) 335-8004
Email: patricia.jannaco@usdoj.gov